**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ **NOV 3 0 2010** ★

**BROOKLYN OFFICE**




UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

STEPHEN JOHNSON,

          Petitioner,

    – against –

WILLIAM PHILLIPS,

          Respondent.

**MEMORANDUM
AND ORDER**

02-CV-5790

**JACK B. WEINSTEIN, Senior United States District Judge:**

Alan M. Nelson, AN 3891, Lake Success, N.Y., for petitioner.

Richard A. Brown, District Attorney; John M. Castellano, Assistant District Attorney; and Ushir Pandit, Assistant District Attorney, for respondent.

I.    Introduction ........................................................................................................... 2

II.   Facts ..................................................................................................................... 3

   A.  The Murders and Investigation ......................................................................... 3

   B.  Trial .................................................................................................................. 4

      1.  Petitioner's Desire to Find and Interview an Exculpatory Witness .................. 4

      2.  Ethics Complaint and Pre-Trial Proceeding ................................................. 5

      3.  Evidence and Arguments Concerning the Eyewitness Identifications ........... 10

   C.  Post-Conviction History ................................................................................. 13

      1.  Petitioner's Correspondence with Appellate Counsel ................................. 13

      2.  Post-Conviction Procedural History in State Courts .................................... 15

      3.  *Habeas Corpus* Petition ............................................................................ 17

III.  Applicable Law ................................................................................................... 19

   A.  Antiterrorism and Effective Death Penalty Act .............................................. 19

   B.  Exhaustion ..................................................................................................... 21

   C.  Procedural Bar ................................................................................................ 23

   D.  Limitations Period .......................................................................................... 25

   E.  Ineffective Assistance of Counsel .................................................................. 28

IV.  Analysis of Claims .............................................................................................. 31

    A.   Ineffective Assistance of Trial Counsel...........................................................................31

    B.   Ineffective Assistance of Appellate Counsel....................................................................33

V.   Conclusion...........................................................................................................................34

## I. **Introduction**

Petitioner-movant Stephen Johnson moves pursuant to Rule 60(b) of the Federal Rules of

Civil Procedure to vacate a denial of his *habeas corpus* petition. Affirmation in Support of

Motion to Vacate the Judgment ("Motion to Vacate"). He claims ineffective assistance of

appellate counsel and of trial counsel. Supplemental Papers in Support of Pro Se Petition

Brought under U.S.C. 2254 at 3 ("Pet. Supp. Br."). He is currently serving a sentence of 91 and

two-thirds years in a New York prison for a 1994 double murder. The "crux" of his complaint in

its present form is state trial counsel's failure to hire an investigator to interview a potentially

exculpatory witness, who might have had information that the murderer was not petitioner. *Id.* at

6.

Counsel for petitioner was appointed. Federal Rules of Civil Procedure 60(b)(4) and

60(b)(6)—the only provisions providing a possible basis for setting aside the dismissal of the

*habeas* petition—permit a broad variety of claims for relief from a judgment; the court has

explored all avenues of possible attack on the judgment (affirmed by the Court of Appeals) at

length in this memorandum to ensure that the motion has no possible basis.

For the reasons that follow, most of petitioner's claims in this court have no merit, and

the rest have not been exhausted in New York courts. The petition is dismissed. *See* 28 U.S.C. §

2254(b)(1).

## II. **Facts**

### A. **The Murders and Investigation**

Katherine Vines and Leslie Paul Laidley were murdered in separate apartments in a house on Linden Boulevard in Queens, New York, on November 25, 1994. *Johnson v. Phillips*, No. 02-CV-5790 (JBW), 03-MISC-0066 (JBW), at 1 (E.D.N.Y. Sep. 29, 2003); Declaration of Alan M. Nelson at 2 ("Nelson Decl."). The house apparently was occupied largely by drug abusers and was the site of frequent drug sales. *Johnson*, 02-CV-5790 (JBW) at 1. On the night of the murders, Laidley was in an upstairs apartment playing cards and drinking alcohol with five others. *Id.*; Nelson Decl. at 2. Several of the people present had been smoking crack cocaine; Laidley was still smoking it that evening. Trial Tr. at 597, 841. Candles lit the room because the house had no electricity. Nelson Decl. at 2.

Those in Laidley's room heard Vines screaming and then a gunshot. Vines had been stabbed fifty-one times with an ice pick and shot in the abdomen. A knock was then heard on Laidley's door; Laidley opened the door to two men and spoke with them for a moment. One of the two intruders pushed open the door and shot Laidley in the head, killing him; he then fired repeatedly into the room, wounding two others. *Johnson*, No. 02-CV-5790 (JBW) at 1; Nelson Decl. at 2.

Police soon identified Petitioner Johnson and his brother as suspects in the murders, but the two could not be immediately located. Johnson was found in Massachusetts in August 1996 and extradited to New York. Johnson was indicted in January 1997. In February 1997 he was identified in a police lineup as the shooter of Laidley by three of the people who were in the room. Nelson Decl. at 3; *Johnson*, No. 02-CV-5790 (JBW) at 1–2.

3

## B. Trial

### 1. Petitioner's Desire to Find and Interview an Exculpatory Witness

Attorney Michael Schwed was appointed as Johnson's trial counsel in January 1997. Nelson Decl. at 3. In September 1997, Johnson wrote trial counsel requesting information about his case, complaining that counsel had not interviewed him. Letter from Stephen Johnson to Michael Schwed (Sept. 24, 1997) (Pet. Ex. A). On October 1997 Johnson moved for the appointment of new counsel, asserting a conflict of interest, ineffectiveness, and a "complete lack of confidence" in his representation. Affidavi[t] in Support of Motion for Reassignment of Counsel, *New York v. Johnson*, No. 3290/96, 2–3 (N.Y. Sup. Oct. 28, 1997) (Pet. Ex. B). The motion was denied. Nelson Decl. at 4.

In August 1998, Johnson complained again to trial counsel of his apparent lack of interest in the case and his failure to communicate. Letter from Stephen Johnson to Michael Schwed (Aug. 27, 1998) (Pet. Ex. C). Johnson wrote that at a hearing earlier that year, he had asked counsel to hire a private investigator to search for a witness who had made "a vital statement, concerning [his] case." *Id.* In the letter, Johnson provided the witness's first name, age, former address, and phone number and again asked counsel to move for the appointment of a private investigator to investigate the statement. *Id.* Attached to his letter was a copy of a report sent by the prosecution as part of its *Brady* materials. *Id.* In it a police officer reported his interview with a witness, Bobby McLeod; it indicated that the murders were committed by a crack user named Ronald Haile, also known as "Black":

> The last time they got high together (Bobby and Black) they went to Paul's house with Cathy. That's when the discussion of Cathy's death came up. Black stated to Bobby "I had to do it" and then explained that he went to [the house on] Linden Blvd . . . with two others (Tennessee and another unidentified male) to do a paid hit

4

on Paul. When they went to the door Cathy answered. Black
stated to Bobby "I had to do her right at the door and then ran
upstairs to Paul's room." Paul met us at the door he was shot right
at the door and then they proceeded to shoot up the room.

Black further stated to Bobby the killing was a contract hit
on Paul from the American Towers.

Bobby . . . states he has known "Black" for about 1 year
and has been to his house. . . .

A Department photo of Ronald Haile . . . was shown to the
witness for identification purposes. Ronald Haile is the male
known as "Black."

Report of Police Interview of Bobby McLeod at 1–3 (Pet. Ex. D) (emphasis removed from

original). The report was signed by McLeod. *Id.* at 3. Johnson contends that trial counsel did

not hire an investigator to interview McLeod before the trial was to begin and that he did not

justify to Johnson his failure to do so. *See* Nelson Decl. at 5.

An evidentiary hearing was conducted in this court to supplement the hearings it held on

the federal petition for a writ. *Cf.* 28 U.S.C. § 2254(e)(2) (no evidentiary hearing under certain

conditions).

State trial counsel Schwed testified that he had hired an investigator but that the

investigator could not find McLeod. Hr'g Tr., 32–33, Nov. 5, 2010. He did not remember who

the investigator was or when he was hired. *Id.* He testified that the prosecution waited for a year

before providing the defense with the police report concerning McLeod, even though it was

exculpatory *Brady* material. *Id.* at 33–34. Trial counsel was a credible witness. His testimony is

found to be accurate.

### 2. **Ethics Complaint and Pre-Trial Proceeding**

In a letter dated April 12, 1999—the day before the state trial was to begin—Johnson

filed an ethics complaint against trial counsel. Letter from Stephen Johnson to Robert H.

5

Strauss, Chief Counsel, Grievance Comm. for the 2nd and 11th Districts, April 12, 1999 (Pet Ex. E). He alleged that counsel failed to communicate with him and urged him to plead guilty despite his continued refusal to do so. *Id.* at 1–2. He also wrote, "I asked Mr. Schwed to make an application . . . to obtain a Private Investigator for the defense so that a witness could be interviewed that had exculpatory information and was willing to make a statement that was exculpatory in nature and, my assigned attorney refused to do so[.]" *Id.* at 2.

A copy of this letter was sent by Johnson to the state trial judge. *Id.* at 3. At a hearing on April 13, the first day of trial, trial counsel asked to be relieved because Johnson had "placed [him] in an adversarial position . . . before the grievance committee." Trial Tr. at 29–30. The court denied the request. *Id.* at 30–31. It ruled that Johnson "must have made this [request] after he went back to the pen seeking no more than to delay this trial." *Id.* at 30. The court found "no conflict in representing the defendant"; it found that "the defendant provided no basis in law for counsel to be relieved." *Id.* at 31.

At this hearing, trial counsel asked the court to appoint an investigator to "locate . . . a potential witness." *Id.* While it was not found that Johnson had complained in his grievance letter of counsel's prior failure to investigate a witness, the court granted the request. *Id.* This evidence supports trial counsel's recollection that he sought to find and interview the potential witness who could not be located.

No witnesses were called in Johnson's defense. *Johnson*, No. 02-CV-5790 (JBW) at 2.

Counsel waived an opening statement. Trial Tr. at 428. He asked about McLeod while cross-examining a police investigator who was assigned to the case, eliciting hearsay on hearsay about the alleged "true" murderer. This technique gave defendant much of the advantage he

6

might have obtained from the missing witness, by blowing the smoke of a guilty third party into the jurors' minds.

> Q:     You also received information, did you not, that Mr. Ron Haile was the individual who committed the murder?
>
> . . .
>
> A:     From another detective, yes.
>
> Q:     And was that from an individual that was interviewed by the name of Robert McLeod?
>
> A:     Yes.
>
> . . .
>
> Q:     And Mr. McLeod had related a conversation that he had with Ron Haile in which Ron Haile admitted committing the crimes; isn't that right?
>
> A:     According to Mr. McLeod, yes.
>
> . . .
>
> Q:     And in that statement did Mr. McLeod indicate to you exactly how the murders occurred?
>
> A:     I think I explained to you, he didn't speak to me. He spoke to another detective.

Trial Tr. at 552–53.

> Q:     . . . I believe the last question I had asked you had to do with the fact that the statement made by Bobby McLeod as to what Ron Haile had told him coincided with the actual facts of this case.
>
> A:     Not to me.
>
> Q:     Did not coincide?
>
> A:     With the facts that I had?
>
> Q:     Yes.

7

A:    No.

Q:    Well didn't Bobby McLeod say that Ron Haile
indicated that he had gone to the house and killed Katherine Vines
at the front door, then he went upstairs and shot Paul in the head?
Then fired shots into the room?

. . .

A:    Basically, a detective from my office went to the
109th precinct where Mr. McLeod was arrested, interviewed him
regarding information that he said he had.  He said that he was
hanging out with a guy in the park smoking crack. . . . [T]his guy
"Black" told him they went to Paul's house.  That Paul and
Kathy's death came up and this guy "Black" stated to Bobby "I
had to do it."

He went to the location with two others to do a paid hit on
Paul.  When they went to the door, Kathy answered.  Paul stated to
Bobby, "I had to do her right at the door", and then ran upstairs to
Paul's room.

Paul met them at the door.  He was shot right at the door.
And he proceeded to shoot up the room.  And that, again, it was a
crack hit on Paul from the American Towers.

. . .

Q:    He indentified the individual by the name of Black
as Ron Haile; is that correct?

A:    That's correct.  That is Mr. Haile's nickname.

Trial Tr. at 555–57.

On redirect examination, Quinn stated that he put little faith in McLeod's statement for

two reasons. First, it disagreed with accounts from other sources that tended to corroborate each

other. *Id.* at 558. Second, the eyewitnesses to the murder were familiar with Haile, but they did

not identify him as the murderer. *Id. Accord* Trial Tr. at 605, 622 (testimony of eyewitness

Victoria Bridgewater); *id.* at 853 (testimony of eyewitness Larry Joe).

8

The government called Ronald Haile as a witness. Haile, a convicted drug dealer on parole from a felony assault conviction, had dated Vines for several months. Haile testified that he had introduced Johnson, Johnson's brother, and a third individual to Vines so that she could sell crack cocaine on their behalf from her home. Haile testified that a week before the murders, Johnson and Vines had argued and that Vines told Johnson not to come to her house anymore. *Johnson*, No. 02-CV-5790 (JBW) at 2; Nelson Decl. at 1–2.

On cross examination, counsel asked Haile several questions concerning his reported conversation with McLeod, but Haile could add little that was helpful to the defense.

> Q:    Did you ever tell anyone in February of 1995 that you were paid to go in Katherine's house to kill Paul?
>
> A:    No.
>
> Q:    Then when you got to the door, Katherine was there and you did her right by the door?
>
> A:    No.
>
> Q:    You went up the stairs and you shot Paul in the head, then you shot bullets into the room?
>
> A:    No.
>
> Q:    Do you know Bobby McLeod?
>
> A:    No, not by that name.
>
> . . .
>
> Q:    He knows you.
>
> . . .
>
> Q:    Do you hang around in the park?
>
> A:    No.
>
> . . .

9

> Q:     Are you known by the name of Black? Is that your nickname?
>
> A:     That's my nickname.

Trial Tr. at 777–778.

Counsel argued in closing that the government improperly discarded Haile's incriminating statements to McLeod. For purposes of this motion only, this court finds that he astutely handled the issue of the "true" murderer as a basis for a "reasonable doubt."

> [W]e know that somebody by the name of Bobby McLeod gets arrested in February. And Bobby McLeod tells the cops after he gets arrested . . . that . . . I was in a park in December with Ron Haile, and he identifies his picture. And Ron Haile said to me that I got paid to kill Paul Laidley. That I entered that house and I did Katherine Vines at the door. Then I went up the stairs, I shot Paul Laidley in the head and I fired shots into the room.
>
> But [the police] dismissed that. It's not important. Well, it's no good for their case. None of the witnesses are saying that Ron Haile was at the door. . . . They are worthless witnesses.
>
> If you take this guy's word for it, then you have to drop the rest of the case. Too difficult to do that. So we just discard what this guy says.
>
> . . .
>
> . . . [W]hy is Bobby McLeod saying that for if he never said it? Why is Bobby McLeod pointing a finger at Ron Haile? Nobody knows.

Trial Tr. at 1111–13.

### 3. Evidence and Arguments Concerning the Eyewitness Identifications

The prosecution's case depended largely on the eyewitness identifications of Johnson as the shooter. Testimony was elicited by defense counsel tending to suggest that the eyewitnesses had difficulty getting a good view of the gunmen. Witness Larry Joe acknowledged that the hall where the gunmen were standing was "pitch black." *Id.* at 843. He stated that the door was open

10

"just a crack" and acknowledged that Laidley was standing in front of the door. *Id.* When Joe was asked if he was able to see the gunman the night of the shooting, he responded, "Halfway, you know." *Id.* at 826. Larry Joe was unable to identify either of the gunmen in a police lineup or to identify Johnson as a gunman in the courtroom. *Id.* at 835, 836.

Witness Andre Scicere testified that he had placed lit candles all about the room, but that he began kicking them out when the shooting began, and that any that he did not put out were probably put out "through the motion of the furniture moving and the wind blowing." *Id.* at 883. Witness Wanda Scicere said that it became dark because "[s]omebody must have knocked the candles over or something" while those in the room were trying to escape. *Id.* at 1070. Andre Scicere told police that he had not been able to see anything because the killing happened so fast. *Id.* at 893. Three to four days later, he told officers he could remember the faces of the killers; he explained at trial that he had previously been "in shock." *Id.* at 894. He identified Johnson in a lineup two years after the killings and identified him again in the courtroom. *Id.* at 875–76.

In the courtroom, two eyewitnesses had difficulty identifying Johnson as the gunman. Witness Victoria Bridgewater testified that she identified the gunman in the police lineup, but that she could not see him in the courtroom because she was not wearing her contact lenses. *Id.* at 600. After being invited twice to step off the stand to walk around the courtroom—once by the State and once by the court—she complied and eventually identified Johnson. *Id.* at 601. Wanda Scicere, who testified in dark sunglasses and with a bandage over her eye, initially stated that she did not see anyone in the courtroom that she recognized from the night of the shooting, even though she had "looked all around the room." *Id.* at 1038–39, 1050. After further questioning, she identified Johnson and explained that she had previously been looking only "into the audience." *Id.* at 1052.

Counsel properly argued in his summation that the eyewitnesses' identifications of Johnson as Laidley's killer were unreliable:

> [Y]ou don't want the person downstairs who may have just killed somebody, who fired that shot, to know that you are upstairs in the room.
>
> . . . You turn out the lights, blow out the candles. We had all of them basically agreeing that the candles are out when they leave the room. And I suggest to you the candles were blown out before the guys even got to the door because they remained quiet and they didn't want anybody to know that they were inside the room. So you blow out the lights.
>
> There is no other light[] in the house. . .
>
> . . . Victoria Bridgewater . . . said to you that when the door opened and the shooter was there, she had to adjust her eyes to the darkness. . . . She wouldn't have had to adjust her eyes unless the room had suddenly gone dark and the room went dark because they blew out the candles.
>
> . . . Once the shots started, they're hitting the ground . . . They're not running around the room blowing out candles. . . .
>
> . . . [T]hat room was pitch black when that knock came on the door.

Trial Tr. at 1102–1103.

> [Witness Bridgewater] was asked can you pick out the person in the courtroom and she said, "I can't pick out anybody, I'm not wearing my contact lenses."
>
> But the prosecution persisted. Well, get down off the stand. So, she gets down off the stand and says, "Okay, that's him", because she's doing what she's supposed to do. She's supposed to pick out the defendant.
>
> . . .
>
> . . . Wanda [Scicere] . . . has got one eye closed, has a bandage over it, is wearing dark glasses. . . .

> ... "Do you see the defendant in the courtroom?" No.
> "Did you look all over the courtroom?" Yes. Defendant is not in
> the courtroom. ...
>
> ...
>
> So finally she realized that she didn't do the right thing and
> then picked out the defendant.
>
> Then we have Andre. Andre who tells the police ... I
> couldn't see anything, the whole thing happened so fast. I never
> saw the person that did the shooting.
>
> But three or four days later, he has some kind of revelation.
> Suddenly, he sees the face of the shooter.

Trial Tr. at 1113–15.

For purposes of this motion only, this court finds that trial counsel's conduct of the trial

complied with minimum constitutional standards.

The jury received the case on April 26, 1999. On April 28, 1999, it returned a verdict of

guilty on all counts. Trial Tr. at 1262–64. Johnson was sentenced to a total of ninety-one and

two-thirds years in prison. *Johnson*, 02-CV-5790 (JBW) at 2.

### C. Post-Conviction History

#### 1. Petitioner's Correspondence with Appellate Counsel

Johnson's counsel on appeal was attorney Barbara Lerner, acting as Of Counsel for Lynn

Fahey. Brief for Defendant-Appellant, *New York v. Johnson*, 282 A.D.2d 548 (2d Dep't 2001)

("Appellate Brief"). In May 2000, Johnson wrote to appellate counsel about a possible appeal

based on ineffective assistance of counsel:

> [C]ounselor never came to see me, never responded to my
> correspondence, and disregarded any other information that I felt
> was necessary to my defense. I placed a motion within the court
> for reassignment of counsel based upon these same complaints.
> The judge refused to entertain the motion because he felt that there
> were no facts present in the motion. ...

13

> I wrote this counselor on many different occasion[s] which I will forward to you, complaining about his lack of interest in my case. I also wrote the judge. . . . The judge [chose] to ignore these claims, he felt that it was a tactic to delay the beginning of the trial. . . . The judge never did a[n] inquiry which is mandated by law. . . .

Letter from Stephen Johnson to Barbara Lerner (May 20, 2000) (Pet. Ex. F).

Counsel responded with her appraisal of Johnson's potential bases for appeal. In it, she does not address Johnson's complaint that trial counsel "disregarded any other information that [he] felt was necessary to [his] defense:

> I have reviewed the record in your case. . . . These ideas may change with further research, but I wanted to let you know my thinking so far. . . .
>
> First, I plan to argue that the prosecution failed to prove your guilt beyond a reasonable doubt. . . .
>
> I also plan to argue that the judge erred in describing the witnesses' identification of you as occurring while their memories were "fresh." . . .
>
> . . .
>
> [I]neffective assistance of trial counsel: You were clearly displeased with your attorney's failure to communicate with you prior to and during the trial. However, in order to prevail on an ineffective assistance of counsel claim, we must be able to show that counsel's performance was lacking in some way that likely affected the outcome of the trial. These are *very* hard claims to win. It is not enough to show that your attorney did not communicate with you or give you paperwork, or even that another attorney would have done a better job. You have to show that there was actual prejudice to your defense. The fact that your attorney did not provide you with paperwork or otherwise communicate with you, while frustrating and not good practice, is not enough. Also, even if the judge's decision denying your motion for new counsel was based on reasons with which you did not agree (i.e., that you were only seeking to delay the trial, that he had a high opinion of the attorney, etc.), the Appellate Division will not reverse on that basis.
>
> . . .

14

> I will be working on your brief over the next several weeks.
> As you requested, I will send you a copy of the brief to review
> before I file it. In the meantime, contact me if you have any
> questions or comments. I will write to you again if further
> research changes my thinking about your case.

Letter from Barbara Lerner to Stephen Johnson (July 12, 2000) (Pet. Ex. G). The record does

not indicate that appellate counsel inquired further into the ethics complaint or McLeod's

statements to the police.

For purposes of this motion only, the court finds that appellate counsel met minimum

constitutional standards.

### 2. **Post-Conviction Procedural History in State Courts**

Johnson's appellate brief was filed on August 29, 2000. Appellate Brief at 1. It made

two arguments: (1) the verdict of guilty contradicted the weight of the evidence; and (2) the jury

charge erroneously led the jurors to believe that eyewitnesses' identifications of Johnson were

made while their memories were fresh despite a two-year delay after the murders. *Id.* at 18, 25.

No ineffective assistance of counsel argument was made.

The direct appeal was denied in April 2001. *New York v. Johnson*, 282 A.D.2d 548 (2d

Dep't 2001), *leave denied*, 96 N.Y.2d 920 (2001). The court held that Johnson had not preserved

for review his "contention that the verdict was not supported by legally sufficient evidence" and

stated in dicta that the "verdict of guilt was not against the weight of the evidence." *Id.* at 548.

On July 10, 2002, Johnson, acting *pro se*, applied to the Appellate Division for a writ of

*error coram nobis*. Notice of Motion for a Writ of Error Coram Nobis, *New York v. Johnson*,

299 A.D.2d 425 (N.Y. App. Div. 2d Dep't 2002) ("*Coram Nobis* Petition"). In it, he asserted

that he was deprived of effective assistance of appellate counsel because appellate counsel failed

to address trial counsel's failure to reopen a hearing to examine eyewitnesses' identification of

15

Johnson in a police lineup. *Id.* at 7–8. He brought to the court's attention the trial court's denial

of his motion for new counsel, but he made no mention of McLeod or of trial counsel's failure to

hire an investigator. *Id.* at 7.

In a response to Johnson's application, appellate counsel Lerner wrote of her

communications with Johnson during the appeal. She did not acknowledge Johnson's accusation

that trial counsel had disregarded important information or that Johnson had complained about

trial counsel's representation in September 1997 and again in August 1998.

> Mr. Johnson and I corresponded in detail regarding potential issues
> in his case. . . .
>
> Mr. Johnson now argues that I was ineffective in failing to
> challenge the trial court's denial of his motion for new counsel. . . .
>
> A criminal defendant must show "good cause" to warrant
> substitute of court-appointed counsel. . . . There is simply no
> evidence in the record that any conflict or impediment to effective
> representation existed in this case.
>
> Mr. Johnson did not raise this issue with me previously,
> although he did ask me to consider an ineffective assistance claim
> based on counsel's failure to communicate with him. . . . I
> explained that counsel's failure to communicate or provide
> paperwork, while frustrating and not good practice, was not
> enough.

Barbara Lerner, Affirmation in Response to Coram Nobis Application at 2–3 (Pet. Ex. H).

In his reply to the State's opposition memorandum, Johnson addressed his prior

complaints about trial counsel but again did not discuss McLeod or the hiring of an investigator:

> Petitioner had complained of counsel's performance prior to trial
> and jury selection. Petitioner had submitted a motion to have his
> trial counsel relieved on October 28, 1997. This was exactly two
> years prior to trial. . . . [T]he motion is part of the record below.
> So, the Respondent's claim that appellate counsel could not have
> raised this issue because it was off the record . . . is without merit
> and not supported by the record.

16

Reply to Respondent's Opposition to Writ of Error Coram Nobis at 2 (Pet. Ex. I).

On November 12, 2002, the Appellate Division denied Johnson's *coram nobis* application in a summary decision, stating that he had "failed to establish that he was denied the effective assistance of counsel." *New York v. Johnson*, 299 A.D.2d 425 (N.Y. App. Div. 2d Dep't 2002). Johnson appealed the denial of his *coram nobis* petition to the New York Court of Appeals, but he did not discuss the factual circumstances of his claim. Criminal Leave Application Pursuant to C.P.L. § 460.20, *New York v. Johnson*, No. 3290/96 (N.Y. App. Feb. 27, 2003). The Court of Appeals declined review. Certificate Denying Leave, *New York v. Johnson*, No. 3290/96 (N.Y. App. Feb. 27, 2003).

Johnson then filed a *pro se* motion before the trial court to vacate his conviction. Notice of Motion and Affidavit in Support of Motion, *New York v. Johnson*, No. 3290/96, (N.Y. Supr. Ct. Nov. 26, 2002) ("Motion to Vacate"). He argued that trial counsel was ineffective because he failed to object to the trial court's characterizations of the eyewitness identifications in the jury charge. *Id.* at 3–4. He did not mention exculpatory witnesses or trial counsel's alleged failure to hire an investigator. *See generally id.* The court denied the motion because "defendant could have raised this issue on direct appeal, but unjustifiably failed to do so." Memorandum, *New York v. Johnson*, No. 3290/96, at 2–3 (N.Y. Supr. Ct. Nov. 26, 2002). Johnson did not appeal. *Johnson*, 02-CV-5790 (JBW) at 2.

### 3. *Habeas Corpus* Petition

#### a. Claims in 2002 Petition

On October 21, 2002, Johnson filed a *pro se* petition for *habeas* relief in this court. *See* 28 U.S.C. § 2254. Petition, *Johnson*, 02-CV-5790 (JBW) at 2 ("Habeas Petition"). It raised five claims: (1) Johnson was denied due process when the trial court gave an erroneous identification

17

charge to the jury; (2) he was denied his constitutional right to counsel of choice and conflict-free representation; (3) he was denied effective assistance of counsel because counsel failed to request to reopen a hearing on the eyewitness identifications; (4) appellate counsel was ineffective for failing to raise ineffective assistance of trial counsel claims and for failing to argue that he was denied the right to be represented by counsel of his choice; and (5) his guilt was not proven beyond a reasonable doubt. *Johnson*, 02-CV-5790 (JBW), at 3.

### b.  **Procedural History of *Habeas* Petition**

After a hearing, by order dated September 29, 2003, Johnson's petition was denied, and a certificate of appealability was denied. Each of Johnson's claims was held to be meritless. *Id.* at 9, 12–15. It was noted that some of his claims were "unexhausted and many appear[ed] to be procedurally barred, some doubly or triply so." *Id.* at 9.

Johnson appealed to the United States Court of Appeals for the Second Circuit. A certificate of appealability was denied, and the appeal was dismissed with prejudice. *Johnson v. Phillips*, No. 02-CV-5790 (2d Cir. May 12, 2004).

On July 7, 2009, attorney Alan M. Nelson was appointed as counsel to represent Johnson. With Nelson's assistance, Johnson moved on July 18, 2009, to vacate this court's judgment denying his *habeas* petition under Federal Rule of Civil Procedure 60(b)(4). On May 18, 2010, an order was issued scheduling a hearing. By order dated November 3, 2010, it was stated that materials outside the pleadings would be considered by the court.

### c.  **Current Claims**

Johnson raises two claims in his current motion: (1) his Sixth Amendment right to effective and conflict-free representation was denied by the trial court's refusal to grant his motion for the appointment of new counsel, and (2) appellate counsel was ineffective because

she failed to raise this issue on direct appeal. Pet. Supp. Br. at 3. Johnson contends that the factual predicate for these claims is Schwed's failure to hire an investigator to investigate McLeod: "The crux of petitioner's consistent complaint has been that trial counsel failed to retain the services of a private investigator for the purpose of interviewing a witness material to the defense despite that request having been made by petitioner repeatedly *for over eight months* prior to trial." *Id.* at 6 (emphasis in original).

### d. Hearing

For the purposes of the original petition and the present motion only, the court finds the following. The testimony and other exhibits indicate that trial counsel made adequate investigation, preparation, and presentation of all useful exculpatory evidence. State trial counsel met constitutional standards of representation. Appellate counsel had no basis to complain of that representation. Appellate counsel's brief and argument were appropriate and constituted constitutionally adequate representation.

## III. Applicable Law

### A. Antiterrorism and Effective Death Penalty Act

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of *habeas corpus* to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

An "adjudication on the merits" is a substantive, rather than a procedural, resolution of a federal claim. *See, e.g., Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (citing, e.g., *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413; *Bell*, 535 U.S. at 694. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411. In order to grant the writ there must be "[s]ome increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted); *see also* Richard S. v. Carpinello, 589 F.3d 75, 80 (2d Cir. 2009).

"[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton*, 295 F.3d 270, 278 (2d Cir. 2002); *see also Yung v. Walker*, 341 F.3d 104, 111 (2d Cir. 2003) (district court's habeas decision remanded for reconsideration in light of "the more general teachings" of applicable Supreme Court decision).

20

The Court of Appeals for the Second Circuit has also indicated that habeas relief may be granted if a state court's decision was contrary to or an unreasonable application of "a reasonable extension" of Supreme Court jurisprudence. *Torres v. Berbary*, 340 F.3d 63, 72 (2d Cir. 2003). Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## B. Exhaustion

In the past, a state prisoner's federal habeas petition had to be dismissed if the prisoner did not exhaust available state remedies as to any of his federal claims. *See Rose v. Lundy*, 455 U.S. 509, 522 (1989). "This exhaustion requirement [was] . . . grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). Exhaustion required the petitioner to have presented to the state court "both the factual and the legal premises of the claim he asserts in federal court." *Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc).

A district court now has four options in dealing with petitions containing exhausted and unexhausted claims—so-called "mixed petitions."

First, it may deny the petition on the merits when the claims are clearly meritless. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state.").

Second, a court may stay a mixed petition when three requirements are met:

21

> [I]t likely would be an abuse of discretion for a district court to
> deny a stay and to dismiss a mixed petition if [1] the petitioner had
> good cause for his failure to exhaust, [2] his unexhausted claims
> are potentially meritorious, and [3] there is no indication that the
> petitioner engaged in intentionally dilatory litigation tactics. In
> such circumstances, the district court should stay, rather than
> dismiss, the mixed petition. In such a case, the petitioner's interest
> in obtaining federal review of his claims outweighs the competing
> interests in finality and speedy resolution of federal petitions.

*Rhines v. Weber*, 544 U.S. 269, 278 (2005) (citation omitted). *Accord Keating v. New York*, 708

F. Supp. 2d 292, 299, 299 n.11 (E.D.N.Y. 2010); *See also Rhines*, 544 U.S. at 279 (Stevens, J.,

concurring) ("I [concur] on the understanding that [the court's] reference to 'good cause' for

failing to exhaust state remedies more promptly . . . is not intended to impose the sort of strict

and inflexible requirement that would trap the unwary *pro se* petitioner.") (citations and internal

quotation marks omitted).

Third, a district court may allow a petitioner to omit the unexhausted claim and proceed

with the exhausted claim. *Rhines*, 544 U.S. at 278.

Fourth, a district court may dismiss the petition in its entirety without prejudice.

*Rodriguez v. Portunodo*, No. 01 Civ. 547 GEL, 2003 WL 22966293, *3 (S.D.N.Y. Dec. 15,

2003).

The state may waive the exhaustion requirement, but a "State shall not be deemed to have

waived the exhaustion requirement or be estopped from reliance upon the requirement unless the

State, through counsel, expressly waives the requirement." *Id.* § 2254(b)(3); *see also Graziano

v. Lape*, No. 9:04-CV-84, 2008 WL 2704361, at *5 n.9 (N.D.N.Y. 2008) (state's failure to raise

exhaustion requirement does not waive the issue).

Lack of exhaustion is a serious problem in this case.

## C. **Procedural Bar**

A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. In determining whether a procedural bar is sufficient to preclude habeas review, a federal court must consider as "guideposts" the following:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Clark v. Perez*, 510 F.3d 382, 391 (2d Cir. 2008) (quoting *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003) (citing *Lee v. Kemna*, 534 U.S. 362 (2002))).

State procedural rules are insufficient to bar federal review of a claim if the rules are not strictly or regularly followed, *see Barr v. City of Columbia*, 378 U.S. 146, 149 (1964); are novel and unforeseeable, *see NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 457 (1958); allow noncompliance, *see Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 233-34 (1969); or impose undue burdens on the assertion of federal rights, *see Douglas v. Alabama*, 380 U.S. 415, 422-23 (1965). *See also* Ford v. Georgia, 498 U.S. 411, 423-24 (1991); see *generally* Kermit Roosevelt III, *Light from Dead Stars: The Procedural Adequate and Independent State Ground Reconsidered*, 103 Colum. L. Rev. 1888 (2003) (addressing origins of the doctrine).

If a state court holding contains a plain statement that a claim is procedurally barred then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision). If a state court says that a claim is "not preserved for appellate review" and then rules "in any event" on the merits, the claim is not preserved. *See Glenn v. Bartlett*, 98 F.3d 721, 724-25 (2d Cir. 1996).

"[W]hen a state court uses language such as 'the defendant's remaining contentions are either unpreserved for appellate review *or* without merit,' the validity of the claim is preserved and is subject to federal review." *Fama v. Comm'r of Corr. Svcs.*, 235 F.3d 804, 810 (2d Cir. 2000) (alteration omitted; emphasis added); *see also Jimenez v. Walker*, 458 F.3d 130, 146 (2d Cir. 2006).

Claims that are not found to have been procedurally barred are presumed to have been decided on the merits, so that AEDPA deference applies:

> [T]he Circuit court in *Jimenez* held that "federal habeas courts should distinguish between two mutually exclusive categories of state-court decisions disposing of a federal claim: (1) state-court decisions that fairly appear either to rest primarily on federal law, or to be interwoven with federal law and (2) state-court decisions that fairly appear to rest primarily on state procedural law." 458 F.3d at 138. If the reviewing court determines that it has "'good reason' to doubt that the decision rests on an independent and adequate state ground," *id.* at 137 (quoting Coleman v. Thompson, 501 U.S. at 739), the claim is presumed to have been adjudicated on the merits, and AEDPA deference to the state court adjudication applies. Id. at 146.

*Rush v. Artuz*, No. CV-99-2840, 2009 WL 982418, at *5 (E.D.N.Y. April 10, 2009). "[I]n the absence of a clear and express reliance on a state procedural bar, those state court decisions that

fall within the first category must be 'afforded AEDPA deference as adjudications on the merits under 28 U.S.C. § 2254(d).'" Id. (quoting *Jimenez*, 458 F.3d at 145).

This court makes no finding on the procedural bar issue.

## D. Limitations Period

The limitations period for the filing of an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment is one year. *See* 28 U.S.C. § 2244(d)(1). The period ordinarily begins to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* § 2244(d)(1)(A). A conviction becomes final for habeas purposes when the ninety-day period for filing a petition for a writ of certiorari to the United States Supreme Court has expired. *See McKinney v. Artuz, 326 F.3d 87, 96* (2d Cir. 2003); *see also* Supr. Ct. R. 13.

In calculating the one-year limitation period, the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted." 28 U.S.C. § 2244(d)(2).

The "filing of creative, unrecognized motions for leave to appeal" does not toll the statute of limitations. *Adeline v. Stinson*, 206 F.3d 249, 253 (2d Cir. 2000); *see also Artuz v. Bennett*, 531 U.S. 4, 8 (2000) ("[A]n application is '*properly* filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee. . . . [T]he question whether an application has been 'properly filed' is quite separate from the question whether the claims *contained in the application* are meritorious and free of procedural bar." (emphasis in original; footnote omitted)).

25

The term "pending" in the statute has been construed broadly to encompass all the time during which a state prisoner attempts, through proper use of state procedures, to exhaust state court remedies with regard to a particular post-conviction application. *See* Saunders v. Senkowski, 587 F.3d 543, 548-49 (2d Cir. 2009); *Bennett v. Artuz*, 199 F.3d 116, 120 (2d Cir. 1999), *aff'd*, 531 U.S. 4 (2000). "[A] state-court petition is 'pending' from the time it is first filed until finally disposed of and further appellate review is unavailable under the particular state's procedures." *Bennett*, 199 F.3d at 120; *see also Carey v. Saffold*, 536 U.S. 214, 219-21 (2002) (holding that the term "pending" includes the intervals between a lower court decision and a filing of a notice of appeal in a higher court).

The period of limitations set forth in AEDPA ordinarily does not violate the Suspension Clause. *See Rodriguez v. Artuz*, 990 F. Supp. 275, 283 (S.D.N.Y. 1998), *aff'd* 161 F.3d 763 (2d. Cir. 1998), (AEDPA statute of limitations is not, "at least in general," an unconstitutional suspension of the writ); *see also* Hill v. Dailey, 557 F.3d 437, 438 (6th Cir. 2009) ("Like every other court of appeals to address the issue, this court has held that AEDPA's one-year statute of limitations does not improperly suspend the writ of habeas corpus." (citing cases)); *Muniz v. United States*, 236 F.3d 122, 128-29 (2d Cir. 2001) ("[T]he Suspension Clause does not always require that a first federal petition be decided on the merits and not barred procedurally[.]" (internal quotation marks and alteration omitted)).

"[A]n application for federal habeas corpus review is not an 'application for State post-conviction or other collateral review' within the meaning of 28 U.S.C. § 2244(d)(2)," and therefore the section does "not toll the limitation period during the pendency of [a petitioner's] first federal habeas petition." *Duncan v. Walker*, 533 U.S. 167, 181-82 (2001). Although AEDPA's one-year limitations period is not tolled during the pendency of a properly filed

federal habeas petition, this statute of limitations is not jurisdictional and may be tolled equitably. *See* Diaz v. Kelly, 515 F.3d 149, 153 (2d Cir. 2008); *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000). "To warrant equitable tolling, a petitioner must show (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Diaz*, 515 F.3d at 153 (internal quotation marks omitted).

Prisoners cannot circumvent the strict AEDPA limitations period by invoking the "relation back" doctrine, arguing that a new petition should be treated as having been filed on the same day as a first petition. *See Gannon v. Continuum Health Partners, Inc.*, No. 06 Civ. 5133, 2007 WL 2040579, at *4 (S.D.N.Y. July 12, 2007) ("The Second, Third, and Ninth Circuits agree with the First that, in the context of habeas petitions, the relation back principle is inapplicable where an entirely new complaint is filed.") (citing cases). As the Court of Appeals has explained:

> If the limitations period were interpreted as Petitioner argues, the result would be impractical. A habeas petitioner could file a non-exhausted application in federal court within the limitations period and suffer a dismissal without prejudice. He could then wait decades to exhaust his state court remedies and could also wait decades after exhausting his state remedies before returning to federal court to "continue" his federal remedy, without running afoul of the statute of limitations.

*Warren v. Garvin*, 219 F.3d 111, 114 (2d Cir. 2000) (alterations omitted; quoting *Graham v. Johnson*, 168 F.3d 762, 780 (5th Cir. 1999)).

A habeas petition can be "amended or supplemented as provided in the rules of procedure applicable to civil actions." 28 U.S.C. § 2242. A motion to amend a petition where the statute of limitations has run is governed by Rule 15(c) of the Federal Rules of Civil Procedure. *Fama v. Commissioner of Correctional Services*, 235 F.3d 804, 815 (2d Cir. 2000). Pursuant to Rule

15(c)(1), "[a]n amendment to a pleading relates back to the date of the original pleading when: . . . (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading[.]"

A proposed amendment does not relate back to the original petition "when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle v. Felix,* 545 U.S. 644, 650 (2005). An amended petition does not relate back merely because it and the original petition stem from the same trial and conviction. *Id.* at 662-64.

This court makes no finding on the limitations period issue.

### E. Ineffective Assistance of Counsel

The Sixth Amendment requires that criminal defendants "shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right to counsel is "the right to the effective assistance of counsel." *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (emphasis added). The Supreme Court has explained:

> In giving meaning to the requirement ... we must take its purpose—to ensure a fair trial—as the guide. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

*Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

In order to prevail on an ineffective assistance claim, a petitioner must prove both that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," *id.* at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at

694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Ineffective assistance of counsel may be demonstrated where counsel performs competently in some respects but not in others. *See Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir.2003).

In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the "cumulative weight of error" in order to determine whether the prejudice "reached the constitutional threshold." *Lindstadt v. Keane*, 239 F.3d 191, 202 (2d Cir.2001). "Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Henry v. Poole*, 409 F.3d 48, 64 (2d Cir.2005) (original emphasis; quoting *Strickland*, 466 U.S. at 694); *see also Rosario v. Ercole*, 601 F.3d 118, 122-28 (2d Cir.2010).

Strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91; *see also Eze v. Senkowski*, 321 F.3d 110, 136 (2d Cir.2003). Counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The duty to investigate does not require counsel to conduct a searching investigation into every defense, *see id.* at 699, or "to scour the globe on the off-chance that something will turn up." *Rompilla v. Beard*, 545 U.S. 374, 383, 125 S.Ct. 2456,

162 L.Ed.2d 360 (2005). "Reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Id.*; *United States v. Caracappa*, Nos. 09-1177-CR, 09-3115-CR, 2010 WL 2884970, at 12 (2d Cir. July 23, 2010) (quoting *United States v. Eppolito*, 436 F.Supp.2d, 532, 562 (E.D.N.Y.2006). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U .S. at 689; *see also Bierenbaum v. Graham*, 607 F.3d 47, 50-51 (2d Cir.2010).

Each separate factual claim made in support of an allegation of ineffective assistance of counsel must be fairly presented to a state court before a federal habeas court may rule upon it. *See Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir.1991) (dismissing petition as unexhausted where petitioner's claim of ineffective assistance of counsel alleged more deficiencies before the habeas court than were presented to the state court, because "[t]he state courts should have been given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole" (internal quotation marks omitted)). Where an additional factual claim in support of the ineffective-assistance allegation merely "supplements" the ineffectiveness claim and does not "fundamentally alter" it, dismissal is not required. *Vasquez v. Hillery*, 474 U.S. 254, 260, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); *Caballero v. Keane*, 42 F.3d 738, 741 (2d Cir.1994); accord *Jones v. Keane*, 329 F.3d 290, 294-95 (2d Cir.2003) ("[T]he claim presented to the state court, in other words, must be the 'substantial equivalent' of the claim raised in the federal habeas petition.") (citations omitted).

The *Strickland* test is used with respect to claims of ineffective appellate counsel. *See Forbes v. United States*, 574 F.3d 101, 106 (2d Cir.2009). Appellate counsel does not have a duty to advance every nonfrivolous argument that could be made, *see Jones v. Barnes*, 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), but a petitioner may establish that appellate

counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994). Either a federal or a state law claim that was improperly omitted from an appeal may form the basis for an ineffective assistance of appellate counsel claim, "so long as the failure to raise the state claim fell outside the wide range of professionally competent assistance." *Id.* (internal quotation marks and ellipsis omitted).

## IV. Analysis of Claims

### A. Ineffective Assistance of Trial Counsel

Petitioner's current complaint is that the "crux" of his claim is the failure of trial counsel to hire an investigator to interview Bobby McLeod, a potentially exculpatory witness. Pet. Supp. Br. at 6. This claim shows some merit.

The evidence supports the contention that Johnson twice asked counsel to hire a private investigator to investigate McLeod—once at a hearing in 1998 and once by letter in August 1998. Johnson sent counsel McLeod's age, address, and phone number. He also sent a police report quoting McLeod's account of Haile's description of the killings and his admission that he was hired to kill Paul Laidley and had little choice but to kill Katherine Vines. It was not until trial was underway in April 1999, at least eight months later, that counsel complied with this request and hired an investigator to search for McLeod. It could be concluded that trial counsel's failure to investigate the McLeod lead before the trial began was not a reasonable strategic choice but a breach of an attorney's "duty to make reasonable investigations" and a performance below "an objective standard of reasonableness." *See Strickland*, 466 U.S. at 690–91, 688.

It could be found by state courts that trial counsel's failure to more quickly investigate the McLeod lead was prejudicial to Johnson. Because a more timely response by counsel would

31

have allowed a search to be conducted over a longer period of time and while the lead from police investigators was fresher, it might have enabled McLeod to be located successfully. Testimony from McLeod arguably could have helped establish Johnson's innocence and impeach Haile's testimony, which indicated that Johnson and Vines had had a falling-out the week before the murders. Live testimony from McLeod arguably would have held greater probative value than trial counsel's eliciting of McLeod's statements in his cross-examination of Quinn and his attempt to confront Haile with those statements.

The remaining evidence in the State's case does not appear to have been so strongly supportive of Johnson's guilt that McLeod's testimony—if it could have been attained—might not have helped his case. *See Strickland*, 466 U.S. at 696. The State depended in large part on identifications of Johnson by people who may have witnessed the killings while intoxicated and in a darkened room. Several witnesses had difficulty identifying Johnson after the killings. Any skepticism of the jury toward those identifications could have been heightened by testimony by McLeod.

While this claim conceivably has merit, Johnson failed to exhaust it in the New York courts. He acknowledges that this claim was not made by his appellate counsel, but he alleges that this was due to her deficiency. *Id.* at 3–4. Johnson asserts that this claim was exhausted by his *coram nobis* petition because "counsel's effectiveness was inextricably intertwined with and of necessity had to be considered by the state appellate courts" in addressing his ineffective assistance of appellate counsel claim. *Id.* at 4.

This argument fails. "A court considering ineffective assistance might never reach the underlying constitutional claims, and the rejection of the ineffective assistance claims[.]" *Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir. 2001). *Turner*, like this case, concerned an ineffective

assistance claim raised before the Appellate Division in a *coram nobis* petition, then denied in an order that did not address the merits of the claim. *Id.* Johnson's claim of ineffective assistance of trial counsel is unexhausted.

This court is not suggesting that petitioner's trial-counsel claims have sufficient merit to warrant the state court's setting aside his conviction.

### B. Ineffective Assistance of Appellate Counsel

Johnson's claim that he was denied the effective assistance of appellate counsel conceivably has merit as well. In his letter to appellate counsel Lerner, Johnson wrote that trial counsel "never came to see me, never responded to my correspondence, and disregarded any other information that I felt was necessary to my defense." Pet. Ex. F. In response, appellate counsel referred only to trial counsel's failure to provide Johnson with paperwork and communicate with him; it appears that she overlooked his reference to trial counsel's disregarding of information. Arguably, she deemed this claim meritless without performing a reasonable inquiry. When she indicated to Johnson that she would continue researching the case, he may have concluded that she would make such inquiries. This may have precluded him from presenting a supplement to her appellate attorney's brief.

A reasonably diligent attorney engaged in criminal appellate work reading Johnson's letter conceivably might have understood that "information . . . necessary to my defense" was a reference to exculpatory evidence and that trial counsel's failure to make a reasonable investigation of potentially exculpatory evidence may be grounds for reversal. *See Strickland*, 466 U.S. at 691. The reference to "information" is vague, but it might have been enough to evoke further inquiry on the part of a skilled advocate. Appellate counsel, like trial counsel, are bound to make reasonable investigations of their clients' claims. This is particularly the case

33

when dealing with an unsophisticated, incarcerated client who has little other access to professional legal advice.

It could possibly be found by state courts that the outcome of Johnson's appeal would have been different had appellate counsel made further inquiry into trial counsel's alleged failure to promptly investigate the McLeod lead. Conceivably, an argument based on those facts would have resulted in a reversal and an order of a new trial.

Despite the possible merit of Johnson's ineffective assistance of appellate counsel claim, it, like his other claim, is unexhausted. For a claim to be exhausted, both its factual and legal premises must be asserted. *Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir. 1982); *Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir.1991). Johnson failed to present to the state courts the factual predicate for the claim he now brings. At no point post-judgment did he direct the State's attention to McLeod's alleged statements, Schwed's alleged failure to hire an investigator to interview McLeod, or Lerner's alleged failure to inquire about Schwed's failure to do so. His *coram nobis* petition concerned ineffective assistance of appellate counsel, but it cannot be read to suggest the factual predicate on which his current claim relies. His claim of ineffective assistance of appellate counsel is unexhausted.

This court is not suggesting that petitioner's appellate-counsel claims have sufficient merit to warrant the state court's setting aside his conviction.

## V. **Conclusion**

1.    No valid claim raised and exhausted by the state court is before this court.

2.    This court would have made the same ruling dismissing the petition for a writ of *habeas corpus* had the evidence now before this court been available before dismissal of his petition. *See Johnson*, 02-CV-5790 (JBW).

34

3.     This court would have made the same ruling denying the Rule 60(b) motion in this case (and a certificate of appealability, if such a certificate were appropriate) had the evidence now before this court been available when that motion was made.

4.     The claims now made were not previously made in the *habeas corpus* petition in this court. Permission to bring such a petition raising such claims may possibly be sought from the United States Court of Appeals for the Second Circuit. A transfer by this court to that court is not desirable in view of the finding by the Second Circuit in *Johnson v. Phillips*, No. 02-CV-5790 (2d Cir. May 12, 2004), and the general lack of merit in the movant's contentions properly before the federal courts.

5.     The motion under Federal Rule of Civil Procedure 60(b) is denied and dismissed.

6.     Appointed counsel shall take any necessary action to preserve the petitioner-movant's rights in this court or the Court of Appeals for the Second Circuit.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:   November 29, 2010
        Brooklyn, New York